# United States Court of Appeals

For the Seventh Circuit

Chicago, Illinois 60604

<u>NOTICE OF ISSUANCE OF MANDATE</u>

DATE:   September 29, 2005

TO:     Norbert G. Jaworski
        United States District Court
        Southern District of Illinois
        Room 142
        750 Missouri Avenue
        P.O. Box 186
        East St. Louis, IL   62202


FROM:   Gino J. Agnello, Clerk

RE:     04-3821
        Brandon, Michael v. Anesthesia & Pain
        97 C 1004, Michael J. Reagan, Judge
        04-4044
        Brandon, Michael v. St. Clair Anesthesia, etal
        03 C 493, Michael J. Reagan, Judge

        Herewith is the mandate of this court in this appeal, along
        with the Bill of Costs, if any.  A certified copy of the
        opinion/order of the court and judgment, if any, and any
        direction as to costs shall constitute the mandate.

        [ ] No record filed
        [X] Original record on appeal consisting of:
**ENCLOSED:**                                              **TO BE RETURNED AT LATER DATE:**
        [5]     Volumes of pleadings                   [ ]
        [3]     Volumes of loose pleadings             [ ]
        [9]     Volumes of transcripts                 [ ]
        [2]     Volumes of exhibits                    [ ]
        [ ]     Volumes of depositions                 [ ]
        [ ]     In Camera material                     [ ]
        [ ]     Other_____ [ ]

                Record being retained for use          [ ]
                in Appeal No. _____

        Copies of this notice sent to:        Counsel of record
        [ ]     United States Marshal
        [ ]     United States Probation Office
**NOTE TO COUNSEL:**
        If any physical and large documentary exhibits have been filed in
        the above-entitled cause, they are to be withdrawn ten days from the
        date of this notice.  Exhibits not withdrawn during this period will
        be disposed of.

        Please acknowledge receipt of these documents on the enclosed copy
        of this notice.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
        Received above mandate and record, if any, from the Clerk, U.S.

# United States Court of Appeals

For the Seventh Circuit

Chicago, Illinois 60604

JUDGMENT - WITH ORAL ARGUMENT

**CERTIFIED COPY**

Date: August 15, 2005

BEFORE:        Honorable RICHARD A. POSNER, Circuit Judge

               Honorable FRANK H. EASTERBROOK, Circuit Judge

               Honorable TERENCE T. EVANS, Circuit Judge

Nos. 04-3821 & 04-4044

MICHAEL BRANDON, Doctor,
          Plaintiff - Appellant
   v.

ANESTHESIA & PAIN MANAGEMENT ASSOCIATES, a Corporation, KUMAR RAVI, Doctor, KATHLEEN SLOCOMB, Doctor, et al.,
          Defendants - Appellees


Appeals from the United States District Court for the
Southern District of Illinois
No. 97 C 1004, Michael J. Reagan, Judge

   The judgment of the District Court is REVERSED, with costs, with directions to enter judgment for the plaintiff. The case is REMANDED in accordance with the decision of this court entered on this date.

(1061-110393)

A True Copy:
Teste:
Clerk of the United States
Court of Appeals for the
Seventh Circuit

CERTIFIED COPY

In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-3821, 04-4044

MICHAEL BRANDON,

*Plaintiff-Appellant,*

v.

ANESTHESIA & PAIN MANAGEMENT
ASSOCIATES, LTD., *et al.*,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Southern District of Illinois.
Nos. 97-CV-1004, 03-CV-0493—Michael J. Reagan, *Judge.*

ARGUED MAY 9, 2005—DECIDED AUGUST 15, 2005

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff, a physician, won a $2.53 million judgment in a diversity suit for retaliatory discharge that he had brought in a federal district court in Illinois against his former employer, a corporation named Anesthesia & Pain Management Associates (APM). We affirmed the judgment, 277 F.3d 936 (7th Cir. 2002), but APM refused to pay any part of it. Brandon then filed a

2                                                  Nos. 04-3821, 04-4044

supplementary proceeding, Fed. R. Civ. P. 69(a), in the course of which he learned that after he had filed his tort suit APM had transferred $878,000 in receipts from accounts receivable that it had collected and $300,000 in cash bonuses (for a total of $1,178,000) to the three physicians who owned APM—Drs. Ravi, Slocomb, and Boivin—and to two physicians employed by the corporation, Drs. Gillen and Chintapalli. All five physicians were named as defendants in the supplementary proceeding. The $1,178,000 figure seems to be erroneous; the value of the accounts receivable transferred, so far as we can determine from the record, was not $878,000 but $931,000. That is a matter to be straightened out on remand.

Brandon contended in the supplementary proceeding that the payment to the defendants, after he filed suit against APM, of the bonuses and of the receipts from the collection of the accounts receivable—payments that left APM with only $39,000 in assets—were fraudulent conveyances of property that belonged to the corporation.

Years later he brought a separate supplementary proceeding against the three shareholders, claiming that they were alter egos of APM and therefore personally liable for the corporation's debt to him. This second proceeding named as an additional defendant a corporation, St. Clair Anesthesia Ltd., that APM's shareholders had formed the day after the verdict in Brandon's favor in the tort suit. He claimed that St. Clair was a successor to APM and therefore liable for its debt to him (though there is no "therefore," as we'll see), and alternatively that St. Clair had been formed to squirrel away assets of APM on which Brandon was entitled to levy in order to collect his judgment. After St. Clair was formed, APM ceased to do any business (though it has never been dissolved), except to collect accounts

Nos. 04-3821, 04-4044                                            3

receivable. It was out of receipts from those collections that most of the challenged payments to the individual defendants were made.

Both supplementary proceedings are governed by the law of Illinois, the state that the federal district court in which the suit was filed is located in. Fed. R. Civ. P. 69(a). The district judge dismissed them after a one-day bench trial, ruling that the transfers had not been fraudulent conveyances, that the shareholders were not alter egos of APM, and that St. Clair was not APM's successor.

The district court committed a succession of errors in reaching the startling conclusion that none of the entities from which Brandon is seeking payment of his judgment (the five individual doctors plus St. Clair) owe him anything. The first error was to rule that the accounts receivable were owned by the individual physicians who owned or were employed by APM rather than by APM itself, and the second was to rule that the bonuses the physicians received were in compensation for services they had rendered APM rather than shares of the corporation's profits.

The corporation's practice, which preceded Brandon's lawsuit against it, of deeming its accounts receivable the property of its shareholders and physician employees was actually a device for corporate profit sharing. For when APM's patients paid the receivables, they paid them to APM, not to the receivables' nominal owners, the physicians; and APM used the money to pay its debts and otherwise conduct its business before it paid any of the money to the shareholders and employees. The receivables were thus treated as a corporate asset. *In re Marriage of Rubinstein*, 495 N.E.2d 659, 663 (Ill. App. 1986); *In re Marriage of Davis*, 476 N.E.2d 1137, 1140-41 (Ill. App. 1985); cf. *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 846-47 (7th Cir. 1997); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217

(9th Cir. 1988). As a detail, we note that the price at which the receivables were "sold" to the shareholders and employees was based on the value of existing receivables; no part of the price represented the value of future receivables. Yet it was future receivables that were transferred to the doctors, and these receivables, not having been part of the sales, were unquestionably a corporate asset.

The analysis of the bonuses is similar to that of the proceeds from the collection of the accounts receivable. The bonuses were neither wages contractually due the recipients nor even "earned bonuses" (which the Illinois Wage Payment and Collection Act equates to wages, 820 ILCS 115/2); they were shares of corporate profits. The cash used to pay them was a corporate asset, just like the receipts from collecting the accounts receivable.

The payments to the individual defendants of the bonuses and the receipts were fraudulent conveyances in both senses of the term. There was (1) no consideration (the bonuses were not accrued wages and the defendants had not paid or given other value for the accounts receivable) and there were insufficient remaining assets to satisfy creditors, and (2) the payments were intended to prevent a creditor from collecting on his claim. 740 ILCS 160/5(a)(1), (2); *Gendron v. Chicago & North Western Transportation Co.*, 564 N.E.2d 1207, 1214-15, (Ill. 1990); *Scholes v. Lehmann*, 56 F.3d 750, 756-57 (7th Cir. 1995).

An alternative route that Brandon could have followed would have been to petition APM into bankruptcy; its liabilities (primarily to him) exceeded its assets. Had he followed this route, he could have reached back and undone as preferential transfers the payments to the individual defendants made within a year (now two years, as a result of a 2005 amendment) before the bankruptcy. 11 U.S.C. § 548. The physicians might have benefited from APM's

Nos. 04-3821, 04-4044 5

bankruptcy as well (and if so could have had APM file a voluntary petition for bankruptcy) by limiting their liability and shielding their postpetition income while paying part of Brandon's claim out of prepetition income and assets. By trying to stiff Brandon, they exposed their future assets and income to levy. That is what now comes to pass: money they made, and assets they acquired, long after the verdict will be used to satisfy the judgment debt. They blew their opportunity to use bankruptcy law to enable a fresh start.

Brandon's alter ego theory, an alternative to the fraudulent-conveyance theory, is that the ownership of APM's accounts receivable by the physicians—which, remember, predated his tort suit—and the corporation's practice (also predating the suit) of distributing profits, as they accumulated, in the form of bonuses, meant that APM operated with virtually no corporate assets. It is natural for a group of doctors, faced as they are with the possibility of malpractice suits, to want to operate in a judgment-proof format. But it is a risky gambit, for, since APM was a shell, Brandon was entitled to pierce the corporate veil and levy on the owners' personal assets to the full extent of his judgment; in the jargon of corporate law, the corporation was not a separate entity from its owners but merely their "alter ego." *Mark I, Inc. v. Gruber*, 38 F.3d 369, 371 (7th Cir. 1994); *In re Kaiser*, 791 F.2d 73, 75 (7th Cir. 1986). The owners' liability to Brandon is, moreover, joint and several. *Knickman v. Midland Risk Services-Illinois, Inc.*, 700 N.E.2d 458, 462-63 (Ill. App. 1998); *Fentress v. Triple Mining, Inc.*, 635 N.E.2d 102, 107 (Ill. App. 1994); *Quantum Color Graphics, LLC v. Fan Association Event Photo GmbH*, 185 F. Supp. 2d 897, 901 (N.D. Ill. 2002).

The district judge rejected the alter ego theory on several unpersuasive grounds, such as that APM had not stripped itself of assets in order to prevent Brandon from collecting

his judgment, for the stripping (the purported vesting of ownership of the corporation's accounts receivable in the physicians and the treatment of corporate profits as earned bonuses) had occurred earlier. That is irrelevant and likewise the fact also stressed by the judge that personal-services corporations usually don't have sizable assets compared to other corporations. As the judge himself noted, a principal asset of personal-service corporations is their accounts receivable, and APM stripped itself of this asset.

The alter ego theory offers broader relief to Brandon in one sense, because as we have noted it enables him to collect his entire judgment out of the personal assets of the three shareholder defendants. But he does not seek relief on this theory against the other two physicians, the employees, as to whom he is therefore limited to obtaining the money fraudulently conveyed to them.

Had APM continued in business, it would have earned additional profits on which Brandon could have levied. As the defendants acknowledge, APM was deactivated (except as a conduit of collected receivables to the individual defendants), and St. Clair started up in its place, in order to thwart Brandon's efforts to collect his judgment. The idea was that APM would have no assets to pay Brandon and St. Clair would have no liability to him. Since the bonuses and the payments of the proceeds of collection of the accounts receivable do not add up to the amount of Brandon's judgment, and it is uncertain what personal assets the shareholder defendants have that might be levied on to satisfy the judgment, Brandon is eager to reach St. Clair's assets as well.

The defendants say, presumably tongue in cheek, that St. Clair was formed not to thwart the collection of the judgment but merely to forestall its "negative consequences"—namely a reduction in their wealth! The owner-

ship structure, contracts, etc., of St. Clair appear to be identical (with one exception, discussed below) to the corresponding attributes of APM. Basically what happened was a change in name, and a change in the name of the debtor doesn't defeat a creditor's claim. E.g., *Vernon v. Schuster*, 688 N.E.2d 1172, 1176 (Ill. 1997); *Bernardi Bros., Inc. v. Great Lakes Distributing Inc.*, 712 F.2d 1205, 1207 (7th Cir. 1983) (Illinois law).

But if St. Clair is merely the continuation of APM under a different name, and APM is a shell, St. Clair must be a shell too—so why is Brandon trying to collect from it? But—and this is the exception we referred to—St. Clair owns its own accounts receivable rather than the doctors owning them; at least they didn't own them when the record closed. Some of the receipts from the payment of receivables by patients may therefore still be in St. Clair's possession.

The defendants persuaded the district judge that St. Clair cannot be APM's successor because APM still exists; although it no longer has assets, the defendants pay the State of Illinois the annual fee required to continue a corporation in existence. Successorship or absence thereof might seem irrelevant because a successor corporation, in the sense of a corporation that has purchased all the assets of another corporation which then dissolves, does not inherit its predecessor's liabilities. *Myers v. Putzmeister, Inc.*, 596 N.E.2d 754, 754-55 (Ill. App. 1992); *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) (Illinois law). (The predecessor's take from the sale remains available to satisfy its debts.) But that is in general, not in every case. A "continuation exception to the rule of successor corporate nonliability applies when the purchasing corporation is merely a continuation or reincarnation of the selling corporation. In other words, the purchasing

8                                    Nos. 04-3821, 04-4044

corporation maintains the same or similar management and ownership, but merely 'wears different clothes.'" *Vernon v. Schuster, supra,* 688 N.E.2d at 1176; see also *Steel Co. v. Morgan Marshall Industries, Inc.,* 662 N.E.2d 595, 600 (Ill. App. 1996); *North Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 653 (7th Cir. 1998) (Illinois law). As is implicit in the quoted language, there can be continuation without formal successorship. "Continuation" is just a less colorful name for the "changed name," "different clothes," or "new hat" rule. *Baltimore Luggage Co. v. Holtzman,* 562 A.2d 1286, 1293 (Md. App. 1989). "[I]f a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability." *Vernon v. Schuster, supra,* 688 N.E.2d at 1176; see also *Fenderson v. Athey Products Corp.,* 581 N.E.2d 288, 290 (Ill. App. 1991).

Notice the terms "similar" and "significant" in the passages that we quoted from *Vernon v. Schuster*. That St. Clair has a different practice from APM with regard to accounts receivable does not preclude application of the continuation rule. Otherwise the rule would be too easily evaded. The evasive purpose of creating St. Clair is plain and supports our interpretation of the rule's scope. The rule that a corporation can't have a successor if it hasn't been dissolved, *Domine v. Fulton Iron Works,* 395 N.E.2d 19, 23 (Ill. App. 1979), is not intended to deprive the victim of a fraud of his legal remedy, as the defendants attempted to do here by preserving a ghostly existence for APM. The defendants *admit* that they pay the annual corporate fee for APM for the sole purpose of preventing St. Clair's being held liable for APM's debt to Brandon. It's as if the caretaker of a wealthy old man, who had obtained control of his assets and didn't want them to go to the man's heirs, placed him on life support. APM is brain dead, but is being kept on corporate life support in order to prevent Brandon from getting hold of any of St. Clair's assets.

Nos. 04-3821, 04-4044   9

It doesn't matter whether we call St. Clair APM's continuation, or APM's alter ego (the same corporation, just with a different name), or a fraudulent shield interposed between Brandon's claim and the defendants' assets. See *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 742 (6th Cir. 1999); *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457-58 (11th Cir. 1985). Under any of these formulations, Brandon is entitled to ignore the formation of St. Clair and treat its assets as if they were APM's.

In finding no liability in this case, the district judge may have been confused by the "badges of fraud." This archaic term, an unfortunate legal cliché that like many such can exercise a mesmerizing force on lawyers and judges, refers to a list of 11 symptoms of fraud now codified in the Uniform Fraudulent Transfer Act, which is law in Illinois. 740 ILCS 160/5(b)(1)-(11); *Steel Co. v. Morgan Marshall Industries, Inc.*, supra, 662 N.E.2d at 601-02. The district judge found that five of the "badges" were present in this case, short of a majority and thus not enough, he thought, to prove fraud. But the symptoms are not additive. To treat them as such is the equivalent of saying that if there are 11 common symptoms of serious disease, and a patient has only 5 (a low white corpuscle count, internal bleeding, fever, shortness of breath, and severe nausea), he is not seriously ill. One of the "badges," for example, is that "the debtor absconded." Another is that "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." One would hardly expect to find both of these in the same case, and either one will ordinarily be quite sufficient to entitle the plaintiff to relief.

Critics of the decision of the Uniform State Commissioners to codify the "badges" in the UFTA worried that judges might attach controlling weight to one, Frank R. Kennedy,

"The Uniform Fraudulent Transfer Act," 18 *UCC L.J.* 195, 201 (1986); Jeffrey L. LaBine, "Michigan's Adoption of the Uniform Fraudulent Transfer Act: An Examination of the Changes Effected to the State of Fraudulent Conveyance Law," 45 *Wayne L. Rev.* 1479, 1492-93 (1999), or—we add on the basis of what happened in this case—to whether a majority of them are present or absent. The critics had a point.

There was another reason not to get hung up on the "badges of fraud" in this case: it is misleading to describe the issue in supplementary proceedings to collect a judgment as "fraud." The doctrine of "fraudulent conveyance" has specific elements, as do the alter ego and continuation rules, that differ from normal usages of the word "fraud," which is therefore best avoided. In particular, the doctrine and rules do not require proof of fraudulent *intent*—though there was plenty of that here.

The judgment is reversed with directions to enter judgment for the plaintiff in accordance with this opinion.

REVERSED and REMANDED.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*